IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THORNGLEAN CHANBUNMY          :     CIVIL ACTION
                                             :
                                             :
     v.                                     :
                                             :
                                           :

MICHAEL J. ASTRUE                   :     NO. 07-3098
COMMISSIONER OF SOCIAL SECURITY   :

## REPORT AND RECOMMENDATION

M. FAITH ANGELL                                        April 24, 2008
UNITED STATES MAGISTRATE JUDGE

### I. INTRODUCTION

This is an action brought pursuant to 42 U.S.C. §405(g) seeking judicial review of a final

decision of the Commissioner of the Social Security Administration (Commissioner) denying

Plaintiff's claim for supplemental security income (SSI) under Title XVI of the Social Security Act

(the Act).  Presently before this Court are the parties' pleadings, including Plaintiff's Brief and

Statement of Issues in Support of Request for Review, the Commissioner's response thereto and

Plaintiff's Reply Brief.[1]  On February 26, 2008, counsel presented oral argument.

### II. BACKGROUND

The background and procedural history of this matter was set forth by the Honorable Diane

M. Welsh, United States Magistrate Judge, as follows:

> The plaintiff was born on March 4, 1970 and she is a native
> of Cambodia.  (Tr. 11, 12).  The plaintiff emigrated to the United
> States in 1980.  (Tr. 12).  She went to high school in the United States

---

[1]Consistent with a Procedural Order filed August 15, 2007, the Record, a Complaint, and an Answer have also
been filed in this action.

and went to Community College for one year in Philadelphia to improve her reading in English.  (Tr. 244-45).  The plaintiff has two school-age children which live with her.  (Tr. 245, 246).  The plaintiff has never worked.  (Tr. 252).

At the time of the administrative hearing [held on August 4, 2003] , the plaintiff had been suffering from headaches for a couple of years.  (Tr. 245).  She has the headaches four to five times per week.  (Tr. 245-46).  During a headache, the plaintiff's head feels numb, she gets dizzy and she cannot think.  (Tr. 246).  The plaintiff stated that, at the time she finished high school, her English proficiency was quite good, but, since she started to have headaches with frequency, she has begun to forget much of the English she has learned.  (Tr. 245).  The plaintiff takes medication for her headaches and the medication helps to a degree.  (Tr. 253). However, once the medication wears off, her headaches return.  (Tr. 253).

Many things can cause the plaintiff's headaches.  For one, helping her children with their homework causes headaches.  (Tr. 246).  Thinking about her lifestyle can also cause headaches.  (Tr. 247).  The plaintiff has stopped watching television because doing so can cause headaches.  (Tr. 248).  Reading also causes headaches.  (Tr. 248).  Before the plaintiff had headaches, she used to read books and newspapers in English.  (Tr. 248-49).

The plaintiff also suffers from depression and she receives treatment for her depression at the Warren Smith Center.  (Tr. 249-50).  Previously, she had received treatment twice a month, however, at the time of the administrative hearing [held on August 4, 2003], she was only going once a month.  (Tr. 250).  The plaintiff's family doctor referred her to the Warren Smith Center for treatment because she had become overwhelmed by concern over her daughter having failed a course in school.  (Tr. 250-51).

On a typical day, the plaintiff will cook for her children and do some work at home, such as folding the clothes and making the children's beds.  (Tr. 247).  The plaintiff cooks twice a day and it takes about an hour; she spends about two hours a day doing other chores.  (Tr. 247).  The plaintiff has tried to vacuum, but the noise causes headaches.  (Tr. 247).

The plaintiff is able to go food shopping at a store which is close to where she lives.  (Tr. 251).  The plaintiff does not go out to

2

movies or to visit friends.  (Tr. 252).  She does occasionally attend
family functions, such as birthday parties.  (Tr. 252).  The plaintiff's
ability to enjoy such events depends on whether she has a headache
at the time.  (Tr. 252).

*Chanbunmy v. Barnhart*, CA No. 04-246, Report and Recommendation at 2-3 (E.D.Pa., August 27,

2004).

### III.  PROCEDURAL HISTORY

Judge Welsh also explained the procedural history of this matter.

The procedural background for this case is as follows.  The
plaintiff applied for Supplemental Security Income ("SSI") benefits
on September 5, 2002 alleging that she had been disabled since
October 31, 2001.  The Commissioner denied the plaintiff's claim for
SSI benefits.   The plaintiff then requested a hearing before an
administrative law judge ("ALJ").  A hearing was held on August 4,
2003; the plaintiff was the only witness to testify at the hearing.  On
October 27, 2003, the ALJ issued a Decision wherein she found that
the plaintiff was not disabled.

The plaintiff then sought review of the ALJ's Decision by the
Social Security Administration's Appeals Council.  On December 2,
2003, the Appeals Council denied the plaintiff's request for review
and thereby made the ALJ's Decision the final decision of the
Commissioner.  The plaintiff next sought judicial review in this court.

*Id.* at 1-2.  On August 27, 2004, Judge Welsh recommended that the case be remanded to the ALJ,

and, on September 20, 2004, the Honorable Stewart Dalzell approved and adopted Judge Welsh's

Report and Recommendation.  *Chanbunmy v. Barnhart*, CA No. 04-246, Order (E.D.Pa., September

20, 2004).  Judge Welsh recommended remand on the following grounds:

that a vocational expert should have been employed in making the
determination at the fifth step of the sequential evaluation; that the
Administrative Law Judge must provide an adequate explanation for
determining that the [plaintiff's] testimony was not wholly credible;
for an adequate explanation for the determination that the [plaintiff]
did not have an impairment that met or equaled a listed impairment;

and for an explanation for the rejection of the findings concerning her depression, from her treating physician, and a consultative examiner.

Tr. 265-266. On December 7, 2004, the Appeals Council remanded this case for further proceedings consistent with the District Court's order. Tr. 266. A supplemental hearing was held on April 28, 2005. Ms. Chanbunmy and her attorney were present. Plaintiff testified, as did a vocational expert (VE). A Cambodian interpreter was retained for the hearing; however, he was late and did not participate in the hearing. The hearing was conducted in English. Ms. Chanbunmy had no problem understanding all that was said, and she responded in English. *Id.* Additional medical reports were received and entered into the record. *Id.* In a May 14, 2005 decision, the ALJ again concluded that Plaintiff is not disabled within the meaning of the Social Security Act. Tr. 273-274. Ms. Chanbunmy sought review by the Appeals Council, which was denied on June 8, 2007. Tr. 256-259. On July 30, 2007, Plaintiff filed this action alleging, again, that the Commissioner's final decision denying benefits is not in accordance with the law and is not supported by substantial evidence.

## IV.  SOCIAL SECURITY DISABILITY LAW

### A.  <u>Disability Determination</u>

The Social Security Act authorizes several classes of disability benefits, including SSI and DIB benefits. In order to qualify for benefits, a claimant must be classified as "disabled" under the Act and the accompanying regulations.

To establish a disability under the Social Security Act, a claimant must show that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period". *Fargnoli v. Massanari*, 247 F.3d 34, 38-9 (3d Cir. 2001) (*quoting Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)); 42 U.S.C.

§423(d)(1) (1982).  A claimant can establish a disability in either of two ways: (1) by producing medical evidence that one is disabled *per se* as a result of meeting or equaling certain listed impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2000), or (2) by demonstrating an impairment of such severity as to be unable to engage in any kind of substantial gainful work which exists in the national economy.  *See Hecker v. Campbell*, 461 U.S. 458, 460 (1983); 42 U.S.C. §423(d)(2)(A).

The Commissioner's regulations provide a five-step sequential evaluation process for determining whether or not a claimant is under a disability.  *See* 20 C.F.R. §404.1520.  Step one states that if an individual is found to be working or doing substantial gainful activity, a finding of not disabled is directed regardless of medical findings.  *See* 20 C.F.R. §404.1520(b).  The second step involves evaluating the impairments, and if the claimant cannot prove a severe impairment, a finding of not disabled is required.  *See* 20 C.F.R. §404.1520©.  Step three requires determining whether or not the claimant is *per se* disabled by way of an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1, 20 C.F.R. §404.1520(d).  If the claimant is not *per se* disabled, step four dictates that an individual is not found to be disabled if he is able to perform past relevant work.  *See* 20 C.F.R. §404.1520(e).  Step five requires that if an individual cannot perform past relevant work, other factors must be considered to determine if other work in the national economy can be performed.  *See* 20 C.F.R. §404.1520(f).  *See e.g., Ramirez v. Barnhart*, 372 F.3d 546, 550-51 (3d Cir. 2004).

It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  *See Plummer*, 186 F.3d at 429 (3d Cir. 1999); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993).  The ALJ's conclusions must be accepted

unless they are without basis in the record.  *See Torres v. Harris*, 494 F.Supp. 297, 301 (E.D.Pa. 1980), *aff'd.*, 659 F.2d 1071 (3d Cir. 1981).

### B. Judicial Review of Disability Decisions

The role of this Court on judicial review is to determine whether there is substantial evidence to support the Commissioner's decision.  *See Fargnoli*, 247 F.3d at 38 (3d Cir. 2001); *Knepp v. Apfel*, 204 F.3d 78, 84 (3d Cir. 2000).  Substantial evidence is defined as the relevant evidence which a reasonable mind might accept as adequate to support a conclusion.  *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000).  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence.  *Id.*

It is not the role of the Court to re-weigh the evidence of record or substitute its own conclusions for that of the ALJ.  *See e.g., Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Upon appeal to this Court, the Secretary's factual determinations, if supported by substantial evidence, shall be conclusive.  The conclusiveness applies both to findings of fact and to inferences reasonably drawn from that evidence.  *See Fargnoli*, 247 F.3d at 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.")

### V.  THE ALJ'S DECISION

The ALJ received medical evidence, heard Ms. Chanbunmy's testimony, and received testimony from a VE.  Proceeding through the five-step evaluation process, the ALJ determined that Plaintiff is a younger individual with more than a high school (or high school equivalent) education. Tr. 273.  She has no past relevant work.  *Id.*  She has not engaged in substantial gainful activity since the alleged onset of her disability.  *Id.*

6

At the second step of the sequential process, the ALJ determined that Ms. Chanbunmy had two impairments that could be defined as severe based on the requirements in the Regulations: depression and chronic headaches.  Tr. 273.  In evaluating the medical evidence, the ALJ noted:

She has been treated by a neurologist for migraine and tension headaches [Tr. 148-156].

> The [plaintiff] has also been treated for depression.  On psychiatric examination on December 28, 1999, she reported having depression with decreased sensation.  She denied suicidal or homicidal ideation, and denied hearing voices.  She had been on Prozac for a week, and reported no improvement.  She denied any perceptual disturbances, and she was alert and oriented times three.  Her short term, delayed, and long-term memory was "okay".  Her Global Assessment of Functioning (GAF) was 40. . . . . . She was started on outpatient treatment and medication.  She was discharged on April 30, 2002, and her discharge summary noted a concern about her treatment non-compliance [Tr.349-365].

> She returned to treatment at the WES Health Center in September 2002 because she wanted someone to talk to about her problems, she was having difficulty concentrating, and she had run out of refills on her prescription of Celexa.  On examination, she reported having auditory hallucinations, but denied delusions or suicidal or homicidal ideation.  Her memory and concentration were impaired.  She was diagnosed with Major Depression and her symptoms were attributed to her non-compliance with her medications.  Her Global Assessment of Functioning (GAF) was 58.  On examination in November 2002, she reported having crying spells, because of economic and family problems.  Her GAF was 55 . . . . . In therapy records through July 2003, she attributed her depression to her headaches, financial situation, and problems helping her children with their school work [Tr. 142-147 and Tr. 198-237].  Treatment notes through August 2004 note that she was clinically stable [Tr. 349-365].
>                                          . . . . .
> The [plaintiff] has had extensive neurological testing for her complaints of dizziness and headaches, and results of this testing have been consistently normal.  In July 1998, she had a CT scan of the brain which was normal.  In October 2001, she had a MRI scan of the brain, which was also normal [Tr. 93-99].  In November 2001, the [plaintiff's] neurological examination was normal [Tr. 148-156].  Her

7

neurological examination in November 2003 was also normal.  In November 2003, she reported that she continued to have headaches, but she denied photophobia, sonophobia, or nausea associated with her headaches.  In February 2004, a neurologist stated that she had right front temporal region headaches without aura.  She had no history of focal weakness, no loss of consciousness, or seizures.  She had no difficulty speaking, swallowing, or trouble with balance, coordination, or gait impairment.  In September 2004, a specialist in otolaryngology stated that a CT scan of her sinuses was negative for sinus disease, and she did not have sinusitis.  Dr. Lois Sobol stated that her pain appeared to be atypical for migraine.  In December 2004, her neurological examination was, again, normal [Tr. 366-373].  There is no evidence to establish that her condition meets any neurological listing, or any other listed impairment related to chronic headaches.

With regard to the [plaintiff's] depression, the evidence as a whole shows that her depression is not severe enough to satisfy the criteria of Listing 12.04.  She is the sole parent for her children, she is very involved with the school problems of her youngest child, and she maintains the household by herself.  There is no indication that she has difficulty dealing or communicating with friends, neighbors, school personnel or medical professionals.  Based on the record as a whole, because of her depression and somatic complaints, the [plaintiff] has mild limitations in her activities of daily living; mild limitations in social functioning; moderate limitations in her ability to maintain attention, persistence, and pace; and she has had no decompensations.  There is no evidence to establish the "C" criteria of the listings.

In this regard, the [plaintiff] has only been treated as an outpatient, and she testified that she does not even have intensive or frequent outpatient psychiatric treatment.  The [plaintiff] testified that she currently only goes every other month for therapy and a medication check with a psychiatrist.  The [plaintiff] maintains that her initial GAF score of 40 indicates a listing-level impairment, but the evidence as a whole does not support such a finding.  The [plaintiff's] outpatient treatment history is inconsistent with the intensity of symptoms and level of functional impairment suggested by a GAF of 40.  She has never had a psychiatric hospitalization, nor has she been treated in a partial hospitalization program.  Her psychiatrist has reported that her condition is stable with medication.  By June 2004, she was described as "attentive and alert" [Tr. 349-

364].  Further, her normal daily functioning is inconsistent with a listing-level impairment.  She is a single parent, and independently performs all the activities associated with her parenting responsibilities, and maintaining her household.  She is able to make and keep appointments.  Furthermore, the Commissioner has specifically stated that the "GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings" (see Response to Comment relative to the 2000 mental impairment listings).

. . . . .

Dr. Margaret Zalewska, a neurologist, examined the [plaintiff] in November 2001.  She stated that the [plaintiff's] description of her headaches was most consistent with tension type headaches, with possibly superimposed migraine headaches.  The [plaintiff] was started on Pamelor and Paprosyn, and was given samples of Imitrex to use for more severe headaches.  On follow-up examination in January 2002, Dr. Zalewska stated that the [plaintiff] reported improvement in the frequency and severity of her headaches with medication, particularly the Imitrex.  In October 2002, the [plaintiff] reported an increasing frequency of headaches.  She reported daily left-sided headaches with superimposed "bad headaches" at least three or four times a week.  Dr. Zalewska diagnosed migraine headaches, with superimposed tension headaches, and increased her dosage of Pamelor and gave her samples of Vioxx, and prescribed Imitrex [Tr. 148-156].

In a report dated December 17, 2004, Dr. Richard Herman suggested that her overuse of nonsteroidal medications may be contributing to her symptoms [Tr. 366-373].

Tr. 267-270.

As noted above, although the ALJ found that Ms. Chanbunmy had two severe impairments, neither of these impairments, or combination of impairments, met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, App. 1, Subpt. P.

After careful consideration of the entire record, the ALJ found that Ms. Chanbunmy has the residual functional capacity to perform the exertional demands of simple, routine work tasks on a regular and continuing basis at all exertional levels.  Plaintiff requires work that is as self-paced as

9

possible, that is not on an assembly line and that does not mandate team work. Additionally, the

work cannot have hourly quotas so that short periods of inattention can be overcome by brief

increases in pace. Tr. 273. The ALJ concluded:

> [B]ased on the evidence as a whole, the [plaintiff] is able to perform
> simple, routine work tasks on a regular and continuing basis. She
> requires work that is as self-paced as possible, that is not on an
> assembly line and that does not mandate team work. The work
> cannot have hourly quotas so that short periods of inattention can be
> overcome by brief increases in pace. While her headaches may
> interfere with her ability to follow complex or detailed instructions,
> and in conjunction with her depression may cause short periods of
> inattention or slowed performance, they do not prevent her from
> performing all activities of daily living in a timely manner (she makes
> and keeps appointments, she takes care of her household, she takes
> care of and is concerned about her child, etc.). She has no exertional
> limitations.

Tr. 271.

The ALJ noted that the evidence in this matter establishes that Ms. Chanbunmy has no past

relevant work. However, upon consideration of her age, education, and residual functional capacity,

the ALJ determined that there were jobs that exist in significant number in the national economy that

Plaintiff can perform. Tr. 273. The ALJ asked the VE to name jobs Ms Chanbunmy is able to

perform given her residual functional capacity. The VE was to take into account her "age,

educational background, and employment history". Tr. 272. The VE testified that, assuming

Plaintiff's specific work restrictions, she is capable of making a vocational adjustment to other work.

*Id.*

> The vocational expert testified that given all of these factors the
> [plaintiff] could work as folder (DOT code 369 687 018, 8,700 jobs
> locally, 685,000 nationally); office helper/messenger (DOT #239.567-
> 010, 2,600 jobs locally, 142,000 jobs nationally); hand packer (DOT
> #920.587-018, 4,000 jobs locally, 203,000 jobs nationally); and

locker room attendant (DOT #358.677-014, 2,000 jobs locally, 136,000 jobs nationally). The vocational expert explained that the cited DOT numbers for office and packer positions represent sample jobs within the overall job category identified.

The [plaintiff's] attorney asked the vocational expert to assume the GAF score of 40, and the vocational expert testified that if this GAF score represented her functioning, then she could not work. However, as discussed above this GAF score was inconsistent with her intermittent, outpatient psychiatric history and her demonstrated functioning. Therefore, this response to a hypothetical question which was based on a finding not reasonably supported by the evidence is not accepted. Further, as noted above, the Commissioner specifically rejected such a direct linkage between GAF scores and the ability to work.

The [plaintiff's] attorney argued that the work assessment in the consultative examination report [Tr. 167-170] set forth work-preclusive limitations because of the number of "fairs" found by Dr. Goldstein. The vocational expert steadfastly rejected this assertion, noting the definition of "fair" on the form in question specifically states that such activity "is not precluded". She noted that because all the jobs she identified are unskilled and self-paced, it is not relevant that the [plaintiff] has poor functioning in relation to complex and detailed instructions. The vocational expert agreed that a worker with this described level of functioning would not be a stellar employee, and may even have marginal performance, but insisted that she could perform adequately, for eight hours a day, five days a week. The expert further explained that nothing in the record would indicate that she would need more than one day off per month.

The [plaintiff's] attorney also maintained that because unskilled workers are not in demand in the current economy, no employer would hire the [plaintiff] because of her lack of work experience and job skills. He has not submitted any evidence to support this assertion, and the vocational expert cited a variety of unskilled jobs existing in significant numbers in the national economy. Furthermore, it is not material whether or not work exists in the immediate area in which the [plaintiff] lives, whether a specific job vacancy exists for her, or whether she would be hired if she applied for work. (20 CFR 416.966).

Tr. 272. Based upon the credible testimony of the VE the ALJ determined that a finding of not

11

disabled is required for Ms. Chanbunmy.

## VI.  DISCUSSION

The Plaintiff argues that the ALJ made six errors in the evaluation of her disability:

I.  The ALJ erred by failing to adequately explain her finding that Plaintiff does not meet or equal the Listing of Impairments.

II.  The ALJ erred by rejecting medical opinion evidence without good reason or adequate explanation.

III.  The ALJ erred by failing to provide an adequate explanation of her assessment of Plaintiff's Residual Functional Capacity.

IV.  The ALJ erred by relying on Vocational Expert testimony elicited by a hypothetical question that did not include all limitations.

V.  The ALJ erred by failing to inquire whether the Vocational Expert's testimony was consistent with the Dictionary of Occupational Titles and by relying on Vocational Expert testimony containing unexplained inconsistency with the Dictionary of Occupational Titles.

VI.  The ALJ erred by finding Plaintiff's testimony not credible without good reason or adequate explanation.

Plaintiff's Brief at 2, 4, 8, 20, 22, 24.

### A.  <u>Finding that Plaintiff does not meet or equal the Listing of Impairments</u>

Ms. Chanbunmy asserts that the ALJ did not adequately explain her finding that Plaintiff does not meet or equal the Listing of Impairments.

The ALJ's discussion at step three of the sequential evaluation process must be sufficient to allow for meaningful judicial review.  It was in *Burnett, v. Commissioner of Social Security Administration*, 220 F.3d 112, 119-20 (3d Cir. 2000) that the Third Circuit held that an ALJ's failure

to identify any particular listings or to provide any discussion regarding whether a claimant met or medically equaled a listing was insufficient to allow for meaningful judicial review. However, *Burnett* was clarified in *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004) as follows:

> *Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.

*Id.* at 505. *See also Ochs v. Commissioner of Social Security*, 187 Fed. Appx. 186 (3d Cir. 2006); *Rembert v. Commissioner of Social Security*, 142 Fed. Appx. 570 (3d Cir. 2005). The decision of an ALJ does not automatically violate *Burnett* when the decision does not identify the listings he/she considered. Nor does an ALJ's decision violate *Burnett* when it does not contain a separate step three analysis. This obligation can be fulfilled by discussing the medical record after concluding that a claimant's impairments did not equal a listing.

In the instant matter, the ALJ noted in her discussion of Plaintiff's depression how the evidence shows as a whole that the depression is not severe enough to satisfy the criteria of Listing 12.04, sections A and B or C. In regard to Ms. Chanbunmy's daily activities, the ALJ takes cognizance of the fact that Plaintiff is a single parent to two children, and she is very involved with their school problems. Ms. Chanburnmy also maintains her household without assistance, as well as makes and keeps appointments. The ALJ states that Plaintiff indicated that she had no difficulties in dealing or communicating with friends, neighbors, school personnel or her medical providers. Tr. 269.[2]

The ALJ also points out that Plaintiff has only been treated for her depression as an

---

[2]In her completion of an evaluation form from the Bureau of Disability Determination, Ms. Chanbunmy indicated no difficulties with these types of social interaction. Tr. 68.

outpatient, and, by Ms. Chanbunmy's own testimony, it is revealed that she does not have intensive or frequent outpatient psychiatric treatment.[3]  "Her psychiatrist has reported that her condition is stable with medication.  By June 2004, she was described as 'attentive and alert' [Tr. 349-365]."  Tr. 269.   The ALJ opines that:

> [b]ased on the record as a whole, because of her depression and somatic complaints, the [plaintiff] has mild limitations in her activities of daily living; mild limitations in social functioning; moderate limitations in her ability to maintain attention, persistence, and pace; and she has had no decompensations.  There is no evidence to establish the "C" criteria of the listings.

> Tr. 269.

In addition to an analysis of Ms. Chanbunmy's depression, the ALJ discussed the symptoms and limitations associated with her headaches.  Tr. 266.  She noted that "[Plaintiff] has been treated

---

[3]Q.  They reopened your case?

A.  Yeah, uh-huh.

Q.  So it was about two years where you didn't go?

A.  Yes.

Q.  How often do you go now?

A.  Now, every two month.

Q.  Do just see the doctor for medication, or do you also see a therapist?

A.  I see therapist and doctor too.
. . . . .
Q.  Okay, but you're not going like to weekly therapy or group therapy or any other kind of therapy like that?

A.  Like I told the lady in my therapy, I say I don't have any money for riding bus every week, you know.  I told her that I wanted the same day from the doctor and therapy.

Q.  Okay, but she didn't tell you to come every week?

A.  No.

Tr. 389.

14

by a neurologist for migraine and tension headaches [Tr. 148-156, 193, 366-373]". Tr. 267. The ALJ further pointed out that Plaintiff has had extensive neurological testing for her complaints of dizziness and headaches, the results of which have been consistently normal. The evidence revealed a July, 1998 CT scan of the brain which was normal, an October, 2001 normal MRI brain scan, and a neurological examination in November, 2003 that was also normal. When Ms. Chanbunmy underwent another neurological examination in November, 2003, it was again normal, and she denied photophobia, sonophobia or nausea associated with her headaches. In February, 2004, a neurologist stated that Plaintiff had right front temporal region headaches without aura. The ALJ also noted that Ms. Chanbunmy had no history of focal weakness, no loss of consciousness, no seizures, no difficulty speaking, swallowing, no trouble with balance, coordination or gait impairment. In September, 2004, a CT scan of her sinuses was negative for sinus disease. In December, 2004, yet another neurological examination was normal. As the ALJ stated, "[t]here is no evidence to establish that her condition meets any neurological listing, or any other listed impairment related to chronic headaches." Tr. 268.

The ALJ details the findings of Dr. Margaret Zalewska, a neurologist, when she examined Plaintiff in November, 2001, and again in January, 2002. Dr. Zalewska found Ms. Chanbunmy's description of her headaches to be most consistent with tension type headaches, with possibly superimposed migraine headaches. Plaintiff was started on Pamelor, Naproxyn, and Imitrex, and she reported improvement in frequency and severity of headaches with medication. When Ms. Chanbunmy reported an increasing frequency of headaches in October, 2002, she was given an increase in Pamelor, samples of Vioxx and Imitriex. Tr. 269-270. The ALJ also noted that, in December, 2004, Dr. Richard Herman suggested that Plaintiff's overuse of nonsteroidal medications

may be contributing to her symptoms.

The ALJ found Plaintiff's depression and chronic headaches to be considered "severe"; however, she specifically found that "[t]hese medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4". Tr. 273. The ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors when she reached the conclusion that Ms. Chanbunmy did not meet the requirements for any listing.  Her opinion discusses the evidence pertaining to depression and to chronic headaches.  This discussion satisfies the requirement that there be sufficient explanation to provide meaningful review of the step three determination.  After separately discussing Plaintiff's impairments, her complaints of pain, and her daily functioning ability, the ALJ found her able to do simple, routine work tasks on a regular and continuing basis at all exertional levels.  The ALJ also further took into consideration Plaintiff's impairments when she required "work that is as self-paced as possible, that is not on an assembly line and that does not mandate team work".  She added that "the work cannot have hourly quotas so that short periods of inattention can be overcome by brief increases in pace". Tr. 273.  "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir., March 10, 1992) (quoting *Gooch v. Secretary of H.H.S.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988)). *See also Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005).  Substantial evidence supports this decision.

### B. **Rejecting medical opinion evidence**

Ms. Chanbunmy asserts that the ALJ erred by rejecting medical opinion evidence without good reason or adequate explanation.  Specifically, Plaintiff addresses the discussion of Plaintiff's

16

Global Assessment of Functioning (GAF)[4] and  medical evidence of a mental impairment.  *See*

Plaintiff's Brief, 4-6.  Plaintiff specifically cites to GAF scores of 40 given to her by Jeffrey

Woloshin, M.D. in 1999, as well as a WES Health Center Treatment Plan in 2002.; a GAF of 40

given to her by O'Connell D. Miles, M.D. in 2002, and two GAF scores assigned by Dr. Miles of

55 in 2002 and 2003.  Tr. 223, 236, 356, 358, 363.

[A] GAF score, without evidence that it impaired the ability to work, does not establish an impairment.  *See Camp v. Barnhart*, 103 Fed. Appx. 352, 354 (10th Cir. 2004).  The assignment of a GAF score is the last part (or axis) of a mental health practitioner's statement of a diagnosis, and is intended to rate a patient's current general overall functioning, which is useful in tracking a patient's progress in global terms.  *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1984) (DSM-IV).  The GAF scale is intended for use by practitioners in making treatment decisions, *see* DSM-IV-TR at 32-33, and neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score.  In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings."  *See* 65 Red. Reg. 50746-01, 50764-65, 2000 WL 1173632 (August 21, 2000).

*Parsons v. Astrue*, 2008 WL 539060 *7 (N.D.FL. February 22, 2008).  Nonetheless, "[c]ourts in the

Eastern District of Pennsylvania have repeatedly noted that GAF scores constitute medical evidence

---

[4]"Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient.  The scale does not evaluate impairments caused by psychological or environmental factors.  A GAF between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Morgan v. Commissioner of the Social Security Administration*, 169 F.3d 595, 598 n. 1 (9th Cir. 1999).

"A GAF of 40 denotes 'some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, is unable to work),' and a GAF of 41-50 indicates 'serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).'  *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*, at 32, 34 (4th ed. 2000).  A GAF of 40-42 indicates that the person cannot perform competitive work on a sustained basis."  *Cressman v. Astrue*, 2007 WL 2248832 *2 (E.D.Pa. August 1, 2007).

"A GAF of 51-60 indicates 'moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *American Psychiatric Assoc. Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994)" *Khougaz v. Apfel*, 2000 WL 274187 *2, n. 2 (N.D.CA. February 29, 2000).

that is accepted and relied on by physicians, and that where an ALJ fails to explain why the scores have been discounted, a remand is necessary". *Glover v. Astrue*, 2008 WL 517229 *1 (E.D. PA. February 27, 2008). *See also Salgado v. Astrue*, 2007 WL 2404713 *1 (E.D.PA. August 13, 2007).

The record reveals that the ALJ did, in fact, carefully examine Ms. Chanburnmy's GAF scores and conveyed reasonable bases for her decision concerning them. On December 28, 1999, Plaintiff reported having depression with decreased sensation. In her discussion of Plaintiff's psychiatric evaluation done by Dr. Woloshin in 1999, which resulted in a GAF of 40, the ALJ notes that Ms. Chanbunmy denied suicidal or homicidal ideation and denied hearing voices. She denied any perceptual disturbances, and she was alert and oriented times three. Though her short term memory was delayed, her long term memory was "okay". Ms. Chanburnmy was started on outpatient treatment and medication. The record again reveals a GAF of 40 in January, 2002, stating Plaintiff's problems were educational and related to her social environment. It further indicates non-compliance to be a "barrier to treatment". When she was discharged on April 30, 2002, (again with a GAF of 40), her discharge summary also noted concern about Plaintiff's noncompliance with treatment. The discharge summary attributes her difficulties to her social environment, and it indicates a concern for her future compliance. Tr. 267-268, 356-358, 363-365.

The ALJ further noted that Ms. Chanburnmy returned to the WES Health Center in September, 2002, "because she wanted someone to talk to about her problems, she was having difficulty concentrating, and she had run out of refills on her prescription of Celexa". Tr. 268. She reported having auditory hallucinations but denied delusions or suicidal or homicidal ideation, and her memory and concentration were impaired. At that time, Plaintiff was diagnosed with Major Depression; however, her symptoms were attributed to her non-compliance with her medications.

The examination resulted in a GAF of 58.  *Id.*  The ALJ goes on to report that two months later, Ms. Chanburnmy returned again with crying spells due to economic and family problems.  This time Plaintiff was assessed with a GAF of 55.  The record reveals that she suffered from no delusions, suicidality, or homicidality.  Her judgment was intact, as was her recent and remote memory, concentration, and attention.  Her abstract thinking was age appropriate.  Tr. 234.  The ALJ also noted Ms Chanburnmy was assessed as having a GAF of 55 in May, 2003.  At that time the notes from WES Health Centers reveal that her "energy level, ability to enjoy herself, self esteem and concentration are OK".  Plaintiff did not worry as much on her newly prescribed drug, Lexapro.  She, however, worries a lot about her children, a condition known to any parent.   In June, 2003 no change in symptomatology was noted.  Tr. 15.  The ALJ further observed that, through July, 2003, Ms. Chanburnmy attributed her depression to her headaches, financial situation, and problems helping her children with their school work.  Tr. 268, 142-147, 198-237.  "Treatment notes through August 2004 note that she was clinically stable [Tr.349-365]."  Tr. 268.

The ALJ further discusses Ms Chanburnmy's neurological testing and her depression, and explains her reasoning in regard to Plaintiff's reported low GAF scores:

> In this regard, the [plaintiff] has only been treated as an outpatient, and she testified that she does not even have intensive or frequent outpatient psychiatric treatment.  The [plaintiff] testified that she currently only goes every other month for therapy and a medication check with a psychiatrist.  The [plaintiff] maintains that her initial GAF score of 40 indicates a listing-level impairment, but the evidence as a whole does not support such a finding.  The [plaintiff's] outpatient treatment history is inconsistent with the intensity of symptoms and level of functional impairment suggested by a GAF of 40.  She has never had a psychiatric hospitalization, nor has she been treated in a partial hospitalization program.  Her psychiatrist has reported that her condition is stable with medication.  By June 2004, she was described as "attentive and alert" [Tr. 349-365].  Further, her

> normal daily functioning is inconsistent with a listing-level impairment. She is a single parent, and independently performs all the activities associated with her parenting responsibilities, and maintaining her household. She is able to make and keep appointments. Furthermore, the Commissioner has specifically stated that the "GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings" (see Response to Comment relative to the 2000 mental impairment listings).

Tr. 269. Contrary to Plaintiff's assertion that a GAF score of 50 "strongly suggests that an individual is disabled" (Plaintiff's Brief at 6), a GAF of 41-50 indicates serious symptoms or a serious impairment in social, occupation, or school functioning. *See Cressman v. Astrue*, 2007 WL 2248832 (E.D.PA. August 1, 2007). *See also Morgan v. Commissioner of the Social Security Administration*, 169 F.3d 595 (9th Cir. 1999). Whereas, GAF scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupation, or school functioning. *See Khougaz v. Apfel*, 2000 WL 274187 (N.D.CA. February 29, 2000). Courts have, indeed, affirmed ALJs' decisions of nondisability in cases wherein claimants have GAFs in the range of 51-60. *See Morgan, supra* and *Khougaz v. Apfel*, 2000 WL 274187 (N.D.CA. February 29, 2000).

The ALJ has provided a reasonable basis for her decision concerning the denial of benefits to Plaintiff. Substantial evidence supports the ALJ's weighing of Ms. Chanburnmy's GAF scores and her decision concerning them.

## C.  Plaintiff's Residual Functional Capacity

Ms. Chanburnmy asserts that the ALJ erred by failing to provide an adequate explanation of her assessment of Plaintiff's Residual Functional Capacity. *See* Plaintiff's Brief at 8. Ms. Chanburnmy states that the ALJ: "failed to adequately explain why she found the medical opinion evidence she relied on to be more persuasive than other conflicting evidence. She failed to explain

the connection between the evidence she relied on and her own findings.  She failed to explain why

she disregarded some portions of the evidence she relied on".  Plaintiff's Brief at 9.

RFC is the most that a claimant can do despite her limitations.  *See* 20 C.F.R. §§404.1545(a),

416.945(a).  The RFC assessment "must be based on all the relevant evidence in [the claimant's]

case record".  20 C.F.R. §§404.1545(a)(1), 416.945(a)(1).  The ALJ must include in her decision an

adequate rationale to support her factual findings and legal conclusions.  However,

> [t]he [*Cotter*] opinion simply requires that the ALJ indicate that s/he
> has considered all the evidence, both for and against the claim, and
> provide some explanation of why s/he has rejected probative evidence
> which would have suggested a contrary disposition. . . . .the ALJ is
> not required to supply a comprehensive explanation for the rejection
> of evidence; in most cases, a sentence or short paragraph would
> probably suffice.

*Cotter v. Harris*, 650 F.32d 481, 482 (3d. Cir. 1981).

In making her assessment of Ms. Chanburnmy's RFC, the ALJ refers first to Dr. Margaret

Zalewska, a neurologist who first examined Plaintiff in November, 2001.

> She stated that the [plaintiff's] description of her headaches was most
> consistent with tension type headaches, with possibly superimposed
> migraine headaches.  The [plaintiff] was started on Pamelor, and
> Naprosyn, and was given samples of Imitrex to use for more severe
> headaches. On follow-up examination in January 2002, Dr. Zalewska
> stated that the [plaintiff] reported improvement in the frequency and
> severity of her headaches with medication, particularly the Imitrex.
> In October 2002, the [plaintiff] reported an increasing frequency of
> headaches.    She reported daily left-sided headaches with
> superimposed "bad headaches" at least three or four times a week.
> Dr. Zalewska diagnosed migraine headaches, with superimposed
> tension headaches, and increased her dosage of Pamelor and gave her
> samples of Vioxx, and prescribed Imitrex [TR. 148-156].

Tr. 269-270.  The evidence considered by the ALJ reveals that Dr. Zalewska consistently found Ms.

Chanburnmy's neurological examinations to be normal.  An MRI showed no abnormalities.  Tr.

21

151,152-153.  There was an improvement in the frequency and severity of her headaches with Pamelor.  Tr. 151.

The ALJ also looked to Richard M. Herman, MD, Chairman of the Division of Otolaryngology and Albert Einstein Medical Center.  Ms. Chanburnmy saw him for her epistaxis beginning in 1999.  Though an examination at that time revealed prominent vessels in the left anterior septum, the rest of her ENT exam was unremarkable.  The following year, he found no overt evidence of significant sinus disease.  Tr. 89, 90.  The ALJ noted that:

> In a report dated December 17, 2004, Dr. [] Herman suggested that her overuse of nonsteroidal medications may be contributing to her symptoms [Tr. 366-373].  The [plaintiff] testified that her medications help with her headaches, but that the headaches come back in an hour or so, and she takes more medication.  This suggests that her pattern of medication use is contributing or exacerbating her symptoms, and that her headache symptoms would be reduced or controlled by taking less medication and only using medication as prescribed.

Tr. 270.

There is much disagreement between the parties as to the proper weight given to the evidence submitted from Phuong Ngoc Trinh, M.D., who treated Ms. Chanbunmy for many years, and that of Martin B. Goldstein, D.O., who examined Plaintiff on behalf of the Commonwealth.  The ALJ provided an extended explanation concerning her decision regarding the assessments of these two doctors.

> In the first decision, it was noted that the signature on a Medical Assessment of Ability to do Work-Related Activities (Mental), completed on December 2, 2002, was indecipherable [Tr. 157-162]; therefore, it was not accorded significant weight.  The [plaintiff] requested that the District Court determine if the report was written by Dr. Trinh.  The Court declined to make any findings of fact in this regard, and directed that, on remand, an inquiry should be made to

22

Dr. Trinh, to determine the authorship of the report.  No further reports from Dr. Trinh, a family practitioner, have been received. Nevertheless, it is presumed that Dr. Trinh was the author of this report.  However, because Dr. Goldstein's consultative report and functional assessment were accompanied by a detailed narrative and description of the findings upon which the assessment was based, his report and assessment have been accorded greater weight [Tr. 163-166].  Accordingly, for the reasons explained in the first decision, this assessment is given greater probative weight than the unidentified assessment in [Tr. 157-162].  Further, as discussed above, subsequent psychiatric treatment records describe her condition as stable and the frequency of treatment has lessened and she has not required more intensive intervention [Tr. 349-365].  In sum, the evidence as a whole simply does not support a finding that her overall mental functioning is "poor".

Tr. 270.  Dr. Goldstein's assessment was, indeed, accompanied by a detailed narrative report and a description of his findings.  Tr. 167-170.  In the ALJ's first decision, she notes that Dr. Goldstein found Ms. Chanbunmy's memory to be intact, and she did not appear to be disoriented or confused. She "was able to concentrate adequately for the examination".  Plaintiff had full range of motion, her muscle strength was 5/5 in both upper and lower extremities, and her grip strength was 5/5.  The doctor discerned no muscle atrophy or sensory deficits and stated that she "sustained normal speech in English".  Tr. 14.  Dr. Goldstein further states that at the neuropsychiatric consultative evaluation Ms. Chanbunmy asserted that "at times her head hurts so much that she cannot comb her hair".  Tr. 167-170.  Nonetheless, "at the examination, [Plaintiff's] behavior was described as 'quite appropriate,' her mood was normal, her memory was 'intact,' and she was 'able to concentrate adequately for the examination', and 'communicate clearly.'"  Tr. 17, 168-169.

The assessment of Plaintiff done by Dr. Trinh in December, 2002, reveals poor/no ability in almost every category, and very few words of explanation are given.  Tr. 157-162.

Additionally, as the ALJ pointed out, subsequent psychiatric treatment records describe her

condition as stable and the frequency of treatment lessening, and she has not required more intensive intervention.  Tr.. 270, 349-365.

Based upon the evidence as a whole, the ALJ found Ms. Chanburnmy's RFC enables her to perform simple, routine work on a regular and continuing basis.  The ALJ further elaborated by requiring the work to be as self-paced as possible, without an assembly line, and not requiring teamwork or hourly quotas.  Though acknowledging Plaintiff's headaches and depression, the ALJ observed that they do not prevent Ms. Chanburnmy from performing all activities of her daily living in a timely manner.  Tr. 271.

The ALJ's finding concerning Plaintiff's RFC adequately accounted for Dr. Goldstein's finding of her fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention/concentration.  Tr. 165.  It accounted for Ms. Chanburnmy's "fair" abilities by identifying unskilled jobs for her that involve simple work and that require no team projects.

Substantial evidence supports the ALJ's decision concerning Plaintiff's RFC to do simple, routine work tasks on a regular and continuing basis at all exertional levels, with the additional requirements of work that is as self-paced as possible, that is not on an assembly line, and require no team work or hourly quotas.  This determination reasonably considers Ms. Chanburnmy's functional limitations.

### D. **Vocational Expert Testimony**

Ms. Chanburnmy alleges that the ALJ erred by relying on Vocational Expert testimony elicited by a hypothetical question that did not include all limitations.  Plaintiff asserts that the ALJ failed to include Dr. Goldstein's limitations in her RFC assessment of the hypothetical question

24

submitted to the VE.  She further contends that the specific limitations the ALJ found did not fully reflect some of the limitations the doctor reported and ignored others.  She states that the hypothetical question was also defective in that it did not include the findings she made with respect to the broad functional areas referred to in 20 C.F.R. § 416.920a.[5]

In order for a VE's testimony to provide an appropriate basis for decision-making, the ALJ must present the VE with a hypothetical inquiry that "encompasses all the limitations that the ALJ found . . .".  *Plummer v. Apfel*, 186 F.3d. 422, 431 (3d Cir. 1999).  A VE's testimony may be relied upon as substantial evidence to support the ALJ's decision, as long as the hypothetical presented to the VE "fairly set[s] forth every credible limitation set forth by the physical evidence".  *Plummer, supra.  See also Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

Testimony addressing the hypothetical question submitted to the VE reads as follows:

> Q.  Okay, I ask you to consider an individual who has no exertional, postural, manipulative, or environmental limits.  Who needs simple, repetitive and as self-paced as possible work which is not on an assembly line and which does not mandate teamwork.  It has to be work such that there are no hourly quotas, and short periods of inattention can be overcome by brief increases in pace.  Is there work for such an – and assume the person is of the [Plaintiff's] age, education which is a high school – a U.S. high school diploma plus one year of college.  Is there work for such a person?

Tr. 392.  Plaintiff's counsel chose to make further inquiry of the VE:

> ATTY: . . . Now, could you clarify for me how you interpreted the limitation simple repetitive work?
>
> VE: Doing the same thing over and over and unskilled work.

---

[5]"We have identified four broad functional areas in which we will rate the degree of your functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §416.920a(c)(3).

ATTY: Specifically – well, any unskilled work?  Is that basically – were you imposing any limitation on reasoning level?

VE: Well, where you're doing the same thing over and over again. Like with the messenger, you're doing the same thing –

ATTY: Okay.

VE: – over and over again.

ALJ: Would you consider it – to clarify that, would you consider that to be like one or two-step positions?

VE: yes.

ATTY: Okay, are these all involving simple one or two-step tasks?

VE: Yes.

ATTY: Okay, I'd like to pose a hypothetical based on Dr. Trin's [*sic*] limitations reported at [Tr. 157-162].  If we assume an individual with Ms. Chanbunmy's age, education, and lack of work experience, has poor or none ability to follow work rules or relate to coworkers, use judgment, interact with supervisors, deal with work stresses, function independently, or maintain attention and concentration, poor – and poor or none ability to understand, remember, and carry out simple job instructions.   Would that person be able to perform any competitive employment?

VE: No.

ATTY: Okay, I'd also like to ask you another hypothetical, same vocational factors, different limitations.  These are reported by Dr. Goldstein, [Tr. 163-166], and in interpreting – these – this involves a form in which the doctor is given four choices: unlimited, very good, good, fair, and none as far as ability to do certain things. Unlimited or very good means the ability to function in this area is more than satisfactory.  Good means ability to function in this area is limited but satisfactory.  Fair means ability to function in this area is seriously limited but not precluded, and poor or none means no useful ability to function in this area.  And with respect to eight abilities involving making occupational adjustments, Dr. – the finding is fair ability with respect to all eight, and they are follow work rules, relate

26

to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration.  Ability to understand, remember, and carry out simple job instructions is also fair.  Detailed or complex job instructions poor or none, and is also fair with respect to demonstrating reliability.

ALJ: Excuse me.  The job instructions was complicated or regular job instructions?

ATTY: Complex job instructions, poor or none.  Detailed but not complex poor or none.  Simple job instructions fair.  And fair also in demonstrate reliability.   What would be the impact of those limitations on the ability to perform competitive activity?

Tr. 393-395.  A review of the record reveals that the hypothetical inquiry presented to the VE and augmented by Plaintiff's counsel, encompasses all the limitations that the ALJ found, The VE's testimony may be relied upon as substantial evidence to support the ALJ's decision.

### E.  VE's Testimony and the Dictionary of Occupational Titles

Ms. Chanburnmy also argues that the ALJ erred by failing to inquire whether the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT) and by relying on VE testimony containing unexplained inconsistency with the DOT.  She asserts that Social Security Ruling 00-4p obliges an ALJ to inquire on the record whether a VE's testimony is consistent with the DOT, and, if there is a conflict between the testimony and the DOT, the ALJ must obtain an explanation for the inconsistency and decide whether the explanation is reasonable.  Plaintiff asserts that the jobs identified by the VE exceed the "reasoning level" of her limitation and, thus, are in conflict with the DOT.  *See* Plaintiff's Brief at 22-23.

"[The Third Circuit] has not adopted a general rule that an unexplained conflict between a VE's testimony and the DOT necessarily requires reversal."  *Jones v. Barnhart*, 364 F.3d 501, 506,

n. 6 (3d Cir. 2004).  *See also Tisoit v. Barnhart*, 127 Fed. Appx. 572, 2005 WL 751916 (3d Cir. April 4, 2005).

The VE testified that Ms. Chanburnmy could work as a folder, office helper/messenger, hand packer, and locker room attendant.  She "explained that the cited DOT numbers for office and packer positions represent sample jobs within the overall job category identified" Tr. 272.[6]  She considered these jobs to be "one or two-step positions".  Tr. 393-394.

Plaintiff is appears to be most concerned with the "reasoning development" part of the "General Educational Development" (GED) which is part of the DOT.  Ms. Chanburnmy asserts that each of the jobs mentioned by the VE has a reasoning development requirement of "2"[7], rather than

---

[6]The VE testified:

A.  Yes, let's say a folder, folding materials and fabric.  It's light and unskilled.  It is DOT 369.687-018.  Regionally approximately 8,700 jobs exist and nationally 685,000.  An office messenger helper, moving from floor to floor or office to office usually pushing a cart with files or mail.  It's also light and unskilled.  DOT number 239.567-010.  Regionally approximately 2,600 positions and nationally 142,000.  And hand packing, light and unskilled.  DOT number 920 – as representative of a hand packer – 920.587-018, and regionally approximately 4,000 positions and nationally 203,000.

Q.  What about jobs like cleaner?

A.  Usually they are done as part of a team.  They will have their individual tasks, but it's usually kind of a team approach.  Not – I mean it is possible to – people do not work alone.  They usually work in a group.  Locker room attendant is light and unskilled.

Q.  Okay.

A.  DOT is 358.677-014.  Regionally approximately 2,000 positions and nationally 136,000.

Tr. 392-393.

[7]Plaintiff explains that a reasoning development requirement of 1 requires an individual to "apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on a job."  DOT, page 1011.

A reasoning development requirement of 2 requires an individual to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations".  *Id.*  Plaintiff's Brief at 23.

"1".  She feels that this is an inconsistency that the ALJ needs to explain.

"The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."  SSR 00-4p, 2000 WL 1898704 *3 (SSA, December 4, 2000).  It lists "a specific vocational preparation (SVP) time for each described occupation. . . . [U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT".  *Id.* These "regulatory definitions of skill levels are controlling".  *Id.*

"The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857 *4 (S.S.A. 1985).  *See also* 20 C.F.R. § 416.968(a).  "These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis."  1985 WL 56857 at *4.  The mental activities generally required by competitive, remunerative, unskilled work are: 1) "understanding, remembering, and carrying out simple instructions"; 2) making judgments that are commensurate with the functions of unskilled work - i.e., simple work-related decisions"; 3) "responding appropriately to supervision, co-workers and usual work situations"; and 4) "dealing with changes in a routine work setting".  SSR 96-9p, 1996 WL 374185 *9 (S.S.A. July 2, 1996).

Defendant asserts, and Plaintiff does not dispute, that the General Educational Development section of the DOT "embraces those aspects of education (formal and informal) which are required

29

of the worker for satisfactory job performance.  This is education of a general nature which does not have a recognized, fairly specific occupational objective.  Ordinarily, such education is obtained in elementary school, high school, or college.  However, it may be obtained from experience and self-study."  DOT, App. C (Components of the Definition Trailer).  Defendant's Response at 23.

It must be noted that Ms. Chanburnmy has a high school diploma from a school in the United States, as well as an additional year of study at a community college, which provides her with the educational development necessary to perform the demands of the jobs identified by the VE.[8]  As the VE testified, the jobs entailed simple, repetitive, self-paced work.  Tr. 32-92-394.  There is no apparent conflict between the unskilled jobs named by the VE and Plaintiff's general educational development.  Any conflict that may or may not exist between the DOT and the testimony of the VE in this case would not alter its outcome.  There is substantial evidence to support the result.

### F. <u>Credibility</u>

Ms. Chanburnmy finally alleges that the ALJ erred by finding Plaintiff's testimony not credible without good reason or adequate explanation.

It is the ALJ who makes credibility determinations.  *See* 20 C.F.R. §§404.1529, 416.929.  The Third Circuit has indicted that an ALJ's credibility finding is generally entitled to great deference.  *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).The Court determines whether any reasonable fact-finder could have reached the credibility determination made by the ALJ given the evidence of record and the regulatory framework established by the Commissioner.  *See Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

---

[8]"High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above.  We generally consider that someone with these educational abilities can do semi-skilled through skilled work."  20 C.F.R. §416.964(b)(4).

At the conclusion of Ms. Chanburnmy's August, 2003 hearing, the ALJ found that "the [plaintiff's] subjective complaints have been evaluated in accordance with Social Security Ruling 96-7p, and are not wholly credible". Tr. 18. When a subsequent hearing was held in May, 2005, the ALJ made the same finding. "The undersigned finds the [plaintiff's] allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision. Tr. 273.

In her decision, the ALJ notes that "[t]he supplemental hearing was conducted entirely in English, and the [plaintiff] had no problems in understanding everything that was said and she responded in English.[9] Tr. 266. As the ALJ stated, "[t]he [plaintiff's] demonstrated ability to understand and communicate in English at the supplemental hearing, without an interpreter, contradicts her prior claim that she has forgotten how to communicate in English. In addition, as noted in the first decision, a claims representative who interviewed her for the disability report stated that she completed the interview without needing an interpreter, and that her English was ;fine' during the interview [Tr. 74-77]. Tr. 267. However, the ALJ did not find Ms. Chanburnmy's ability to speak English to be determinative, considering other vocational factors. *Id.*

The ALJ noted that Plaintiff has had extensive neurological testing for her complaints of dizziness and headaches, and the test results have been "consistently normal". Medical evidence regarding treatment for her depression reveal a concern about her treatment non-compliance. Tr. 268. Though Ms. Chanburnmy maintains that her initial GAF score of 40 indicates a listing-level impairment, "the evidence as a whole does not support such a finding". TR. 269. The ALJ found her outpatient treatment history to be inconsistent with the intensity of symptoms and level of

---

[9]At Plaintiff's first hearing, Ms. Chanburnmy reverted to speaking Cambodian when she was asked to enumerate her problems. "She said her English was very good after she graduated from high school, but she has forgotten a lot of it since her headaches began." Tr. 16.

functional impairment suggested by a GAF of 40.  *Id.*

> In a report dated December 17, 2004, Dr. Richard Herman suggested that her overuse of nonsteroidal medications may be contributing to her symptoms [Tr. 366-373].  The [plaintiff] testified that her medications help with her headaches, but that the headaches come back in an hour or so, and she takes more medication.  This suggests that her pattern of medication use is contributing or exacerbating her symptoms, and that her headache symptoms would be reduced or controlled by taking less medication and only using medication as prescribed.
>
> The [plaintiff] has never worked because of family responsibilities and lifestyle choices.  There is no evidence that she has any reduction or change in her usual functioning, because of her impairments and symptoms.  She testified that her headaches have recently become worse because she is worried about her daughter, who is doing poorly in school.  Her medical records do not reflect any changes in her physical or mental condition.
>
> . . . . .
>
> The Magistrate's report agreed that the [plaintiff's] effort to mislead the undersigned about her ability to speak English was a valid consideration in assessing her credibility.  This has not changed.  She testified that she stopped mental health treatment for 6 or more months in 2002 because she was feeling better.  Upon her return to treatment, she was given medication and told that she need only come every two months.   She testified that she missed many therapy appointments because she did not have money for bus fare, and began therapy again in June 2004 after missing a significant amount of time.  Nothing in this record (except for Dr. Trinh's excessive limitations) indicates that she is unable to perform all work at all exertional levels.

Tr. 270

It is evident that the ALJ's credibility analysis was not predicated solely on Ms. Chanburnmy's ability to communicate well in English, or lack thereof.  She also found Plaintiff not entirely credible because the medical evidence did not support her subjective complaints of disabling non-exertional functional limitations.  Additionally, numerous facts in the record reasonably support the inference of the ALJ that Ms. Chanburnmy has not been completely credible about her ability

32

to speak English.  Substantial evidence supports the ALJ's finding that Plaintiff is not entirely credible.

## VII.  RECOMMENDATION

Consistent with the above discussion, it is recommended that the decision of the Administrative Law Judge dated May, 14, 2005 be affirmed and that judgment be entered in favor of Defendant.

 S/M. FAITH ANGELL         
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE

33